UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAMIEN GREEN,

        Plaintiff,

      v.                                      Case No. 19-C-1119

CHRYSTAL MELI,
FREDERICK KRON,
MELISSA BLOCK, and
CHERYL JEANPIERRE,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Damien Green, who is representing himself, filed this action under 42 U.S.C. § 1983, alleging that Defendants Chrystal Meli, Frederick Kron, Melissa Block, and Cheryl Jeanpierre violated his Eighth Amendment rights when they demonstrated deliberate indifference to his serious medical needs. Dr. Kron moved for summary judgment on May 18, 2020; Green moved for summary judgment on May 29 and October 27, 2020; and Meli, Block, and Dr. Jeanpierre (State Defendants) moved for summary judgment on August 28, 2020. The court will grant Defendants' motions for summary judgment and deny Green's motions.

## BACKGROUND

**A. Preliminary Matters**

On December 20, 2019, the court set a dispositive motion deadline of May 18, 2020. Dkt. No. 29. On April 13, 2020, the Chief District Judge entered a general order staying deadlines in open civil cases brought by plaintiffs who are or were previously incarcerated within the

Wisconsin Department of Corrections (DOC) and relate to prison litigation in which the Wisconsin Department of Justice (DOJ) currently represents at least one of the defendants. *See* General Order No. 20-8, General Public Order Granting the State of Wisconsin Department of Justice's *ex parte* Motion for Extension of Time due to Extraordinary Circumstances. Although the general order was entered in response to an *ex parte* motion filed by the Wisconsin DOJ, the order stayed *all* deadlines in cases brought by DOC inmates.

On May 18, 2020, Dr. Kron moved for summary judgment. Dkt. No. 43. The next day, the court notified Green that his materials in response to Dr. Kron's motion were due within thirty days and explained the requirements for responding to the motion. Dkt. No. 49. On May 29, 2020, Green filed a combined summary judgment motion and response to Dr. Kron's summary judgment motion. Dkt. No. 50. Although Green filed his summary judgment motion after the May 18, 2020 deadline in the scheduling order, his motion was timely in light of the stay imposed by General Order No. 20-8.

On June 15, 2020, the court set a new dispositive motion deadline of August 29, 2020. The day before the deadline, State Defendants moved for summary judgment. Dkt. No. 67. On September 9, 2020, Green filed a motion to extend his time to respond to State Defendants' motion; the court granted his motion the next day. Green did not move to extend the deadline to file his own summary judgment motion. On October 27, 2020, Green filed a combined summary judgment motion and response to State Defendants' motion. Dkt. Nos. 79–84.

Green captioned one of his response filings as "Plaintiff's Response to Chrystal Meli's Proposed Findings of Fact." Dkt. No. 84. However, rather than responding to State Defendants' proposed findings of fact, Green again responded to Kron's proposed findings of fact, occasionally inserting Meli's name where Kron's name had appeared. *See* Dkt. Nos. 45, 69, 84. Although

district courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in a light most favorable to the plaintiff, there is no requirement that they do so. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016); *see also Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (recognizing that district courts are entitled to insist on strict compliance with the local rules). Here, the court and State Defendants provided Green with notice of the consequences of not responding to proposed findings of fact. *See* Dkt. Nos. 49, 67. Green offers no explanation for why he failed to comply with the procedures governing summary judgment. Under these circumstances, the court will not overlook Green's noncompliance. State Defendants' proposed findings of fact are therefore deemed true.

On November 24, 2020, Dr. Kron filed a motion to strike Green's second motion for summary judgment as it relates to Dr. Kron. Dkt. No. 87. Green filed his second summary judgment motion long after the deadline without explanation and without the court's permission, so the court will deny his second motion because it was not timely filed. The court will consider only his materials in response to State Defendants' motion. The court will deny Dr. Kron's motion to strike Green's second summary judgment motion as moot.

**B. Parties**

Green is currently incarcerated at Wisconsin Secure Program Facility, although at the time relevant to this lawsuit he was incarcerated at Waupun Correctional Institution. Dkt. No. 69 at ¶ 1. Meli is a registered nurse, who at the relevant time worked as the nursing supervisor/health services manager at Waupun. Her responsibilities included managing and supervising inmate health care, developing procedures, monitoring care plans, preparing required reports, and acting as a liaison between disciplines, units, and community health care providers. *Id.* at ¶¶ 2, 6.

3

Block was employed as a "Nurse Clinician II"; her duties included providing skilled nursing care to inmates, assessing and treating patients, assisting physicians, managing medication, providing emergency care, and maintaining medical records. *Id.* at ¶¶ 3, 7. Dr. Jeanpierre and Dr. Kron worked at Waupun as physicians. Dr. Jeanpierre is employed by the DOC; Dr. Kron works for a healthcare agency that contracts with the DOC. *Id.* at ¶ 4; Dkt. No. 45 at ¶¶ 3–4.

**C. Green's Foot Complaints**

Green previously had surgery on his right foot to address a bunion, during which hardware was placed in his foot. Dkt. No. 69 at ¶ 36. Bunion surgery is typically a routine, minimally invasive procedure. *Id.* at ¶ 37. Hardware that is inserted can be later removed or left in to avoid surgical risks. *Id.* at ¶¶ 37, 79. On February 15, 2019, while Green was incarcerated at Columbia Correctional Institution, Dr. Karl Hoffmann (not a defendant) examined Green for a pre-op to remove the hardware from Green's right foot. *Id.* at ¶ 38; Dkt. No. 59 at ¶¶ 5, 8. Green was scheduled for surgery on March 6, 2019, at Divine Savior Hospital. Dkt. No. 59 at ¶ 10.

On February 22, 2019, Green was transferred from Columbia to Waupun. Dkt. No. 69 at ¶ 33. A few days after arriving at Waupun, Block saw Green to address his concerns about his foot surgery. *Id.* at ¶ 39. On February 28, 2019, health services staff informed Green that, because of his transfer, his scheduled surgery at Divine Savior could not be accommodated. *Id.* at ¶ 40. That same day, the health services appointment scheduler tried to call Divine Savior three times but was unable to reschedule Green's appointment. *Id.* at ¶ 41. Green's medical provider was updated, and a referral was made to Waupun Podiatry for a consult. *Id.*

A few weeks later, on March 22, 2019, Green was seen by Dr. Kron for the first time. *Id.* at ¶ 42. Green had requested multiple times to see an advanced care provider because his "bone [was] sticking out of [his] foot." *Id.*; Dkt. No. 45 at ¶ 6. Dr. Kron evaluated Green and noted "no

4

evidence of heat, redness, swelling, [or] purulence." Dkt. No. 45 at ¶ 8. He observed that there was "no actual penetration of the skin by bone or orthopedic hardware." *Id.* Dr. Kron also noted that Green had a normal gait and did not favor his right foot at all. *Id.* Green's treating podiatrist had recommended Gabapentin for pain, but the medical director had previously declined that recommendation. Dkt. No. 45 at ¶¶ 6, 9; Dkt. No. 57 at 4. Instead, after confirming that Duloxetine would not interact with Green's other medications, Dr. Kron ordered Duloxetine for pain and continued Green's prescription for Acetaminophen. Dkt. No. 45 at ¶¶ 11–12. Dr. Kron instructed Green to inform prison staff if the treatment plan was not working after two weeks. *Id.* at ¶ 12. After Dr. Kron determined that Green's foot issues were not emergent, he ordered a podiatry consult. Dkt. No. 69 at ¶ 43.

A few days later, on March 26, 2019, Green was seen by health services staff and given new compression stockings to assist with his mobility and prevent blood clots or edema. *Id.* at ¶ 44. A few weeks later, on April 18, 2019, Green was seen by Waupun Memorial Hospital Podiatry. *Id.* at ¶ 45. The podiatrist discussed with Green his past history with gout and ordered gout medication and Tylenol 3. Dkt. No. 45 at ¶ 15; Dkt. No. 59 at ¶ 13. Afterwards, Green was referred back to Divine Savior due to his statements regarding non-compliance to post op-care recommendations and disrespectful behavior to the podiatrist. Dkt. No. 45 at ¶ 45. The podiatrist refused to see Green again. *Id.*

After returning to Waupun from his appointment, Nurse Ann York (not a defendant) examined Green because he reported feeling ill. *Id.* at ¶ 17. York found no signs of gout. *Id.*; Dkt. No. 59 at ¶ 12. The next day, on April 19, 2019, Dr. Kron examined Green and noted a slight bunion deformity on his right foot; he also found no signs of gout. Dkt. No. 69 at ¶ 47. Based on his and York's examinations, Dr. Kron declined to order gout medication and Tylenol 3. Dkt. No.

5

Case 1:19-cv-01119-WCG   Filed 12/30/20   Page 5 of 15   Document 98

45 at ¶ 19. Dr. Kron did not believe gout was a likely diagnosis, and he was concerned about the serious side effects of these medications. *Id.* at ¶¶ 19, 21; Dkt. No. 59 at ¶ 21. Green continued to receive Duloxetine for his pain. Dkt. No. 45 at ¶ 20.

A few days later, on April 23, 2019, Dr. Jeanpierre examined Green's foot and prescribed Tylenol in addition to Duloxetine for his pain. Dkt. No. 69 at ¶ 49. Dr. Jeanpierre noted that Green misunderstood that he would be rescheduled for surgery within a month, and she explained to him that, due to staffing and schedules, it could take four to six months after being seen by an outside provider to be scheduled for surgery. *Id.* Dr. Jeanpierre also put in an order for Green to have medical shoes that cost more than $75, in addition to the medical shoes he had already been provided. *Id.* at ¶ 50.

The next day, on April 24, 2019, Dr. Jeanpierre had a telephone conference with Dr. Murphy from Divine Savior; he also was concerned about Green complying with his post-op appointments. *Id.* at ¶ 51. Green's file was documented that further discussions with the Department of Corrections Medical Director were necessary regarding Green's treatment. *Id.* at ¶ 52. On June 3, 2019, Dr. Jeanpierre saw Green for various complaints, including right toe pain. *Id.* at ¶ 54. She noted a scar on his right toe that was well healed and no protrusion of bone or hardware from Green's foot. *Id.* Dr. Jeanpierre referred Green to UW Orthopedics for his toe pain. *Id.*

A couple of weeks later, on June 19, 2019, Block saw Green and told him to continue with his current prescribed foot treatment, she also assured him that she would consult with his provider regarding concerns he had with his medication. *Id.* at ¶ 55. Block did not have authority to make changes to prescribed medication. *Id.*

During July, Green was seen in health services and by specialists. *Id.* at ¶¶ 58–71. His Tylenol prescription was increased to extra strength, an order was placed for Indomethacin, which is a medication to relieve pain, swelling, and stiffness, he was given an extra pillow and ice, and he was educated in stretching exercises. *Id.* Green was told that removal of the hardware from his foot was unlikely to change the pain or discomfort in his foot, but at his request, he was allowed to see podiatry for a second opinion to confirm whether surgery would be useful. *Id.* at ¶ 71.

In September through November 2019, Green was seen repeatedly by health services staff, who addressed his medication concerns and updated him regarding his outside provider appointments. *Id.* at ¶¶ 87–88. Because security staff is needed, Waupun is able to allow only a certain number of patients out of the institution on a given day for medical appointments. *Id.* at ¶ 93. Appointments also depend on the availability of the offsite facility; often offsite providers are months out in their scheduling. *Id.* On January 3, 2020, Green had surgery to remove the hardware from his foot. *Id.* at ¶ 78. A few months later, despite multiple requests to be evaluated, Green refused to be seen in health services. *Id.* at ¶ 89. He was observed "playing basketball and running around without any difficulties." *Id.*

**D. Green's Catheter and Stomach Mesh Issues**

On March 28, 2019, Dr. Kron changed Green's supply of replacement catheters to weekly rather than daily. Dkt. No. 45 at ¶ 22. This change was consistent with Waupun's policy regarding catheter replacements. *Id.* On April 2, 2019, Dr. Kron's order was replaced by York's order, which allowed daily replacements. *Id.* at ¶ 23; Dkt. No. 59 at ¶ 16.

Between January 2019 and February 2020, Green made more than sixty requests regarding his stomach pain and his desire to have mesh that had been previously placed in him removed. Dkt. No. 69 at ¶ 91. On August 19, 2019, Green had an ultrasound of his abdomen and scrotal

7

area, which showed nothing outside of the normal limits and revealed that there was no mesh in his abdomen. *Id.* at ¶ 94. Green's previous umbilical hernia surgery was closed with a stitch—no mesh had been used. *Id.* Subsequent tests, including a CT scan, an EGD, and a colonoscopy were ordered to assess Green's GI issues. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

The Eighth Amendment prohibits medical staff from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To determine if the Eighth Amendment has been violated in the prison medical context, [the court] perform[s] a

two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition." *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017) (quoting *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016)).

A jury who credits Green's description of the daily pain and discomfort he experienced as a result of his foot, stomach, and bladder issues could reasonably conclude that he suffered from objectively serious medical conditions. Thus, the question in this case is whether Green has produced sufficient evidence for a jury to reasonably conclude that Defendants were deliberately indifferent to his conditions and pain.

Deliberate indifference is a subjective standard: "The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). In addition, the defendant must have been personally responsible for the violation. *Rasho*, 856 F.3d at 478. "A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Id.* (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)). While defendants do not have to directly participate in the violation to be held liable, they must have "know[n] about the conduct, facilitated[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see." *Id.* (modifications in original) (quoting *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)).

Green alleges his Eighth Amendment rights were violated when Defendants canceled his foot surgery after he was transferred from Columbia to Waupun, when Dr. Kron changed Green's

9

catheter replacements from daily to weekly, and when Meli failed to make an appointment at UW Hospital to remove the mesh in his stomach.

**A. Foot Pain**

While at Columbia, Green had been scheduled for surgery to remove hardware in his foot. State Defendants explain that, after bunion surgery, hardware that is no longer needed can be removed, but it is not necessary to do so. Removal of hardware will sometimes, but not always, resolve complaints of foot pain. Green was scheduled to have hardware in his foot removed on March 6, 2019. Just a few weeks before the scheduled surgery, Green was transferred from Columbia to Waupun. It is unclear why the decision to transfer Green was made, but none of the Defendants made that decision. Due to staffing and security issues, Waupun can accommodate only a certain number of offsite medical appointments each day; many of these appointments are scheduled months in advance. State Defendants explain that Green's surgery was canceled because Waupun could not accommodate the offsite appointment that Columbia had scheduled.

Green asserts that Defendants should have immediately rescheduled his surgery. Setting aside the fact that none of Defendants were responsible for scheduling offsite appointments and that appointments are subject to availability at the offsite provider, State Defendants have shown that efforts were made to reschedule the appointment the same day it was canceled, undermining Green's conclusion that they were deliberately indifferent to his condition. Through no fault of Defendants, the scheduler was unable to reach Divine Savior to reschedule the surgery, so she contacted Green's health care provider, who referred Green to Waupun Podiatry.

All of this happened before Dr. Kron evaluated Green and without his involvement. During the evaluation, Dr. Kron observed that Green's bone was not "sticking out" of his foot as Green asserted. Instead, Dr. Kron observed a normal gait with no evidence of heat, redness, or swelling.

10

Knowing it would be some time before the surgery could be rescheduled, Dr. Kron prescribed Duloxetine for Green's pain after confirming it would not negatively interact with his other medications. Green argues that Dr. Kron should have prescribed Gabapentin as the podiatrist had recommended, but the evidence shows that a prescription for Gabapentin was previously denied by the medical director. Courts routinely reject claims "where a prisoner's claim is based on a preference for one medication over another, unless there is a substantial departure from acceptable professional judgment." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019). Green argues that Duloxetine was inappropriate because it is an antipsychotic medication, but according to the Mayo Clinic, Duloxetine is also used to treat pain caused by nerve damage and chronic pain related to muscles and bones. *See Duloxetine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last visited Dec. 30, 2020). Thus, no jury could reasonably conclude that Dr. Kron acted outside the bounds of his professional judgment when he prescribed Duloxetine.

Finally, Dr. Kron advised Green to follow up with health services in two weeks if his pain persisted, undermining Green's assertion that Dr. Kron was indifferent to his complaints of pain. Although Green would have preferred Dr. Kron to immediately reschedule the surgery, this was not Dr. Kron's responsibility or even within his control (appointments are subject to availability at the offsite provider). Dr. Kron did what he could—he scheduled Green for a podiatry consult and prescribed him pain medication. On this record, no jury could reasonably conclude that Dr. Kron was deliberately indifferent to Green's foot issues.

A few weeks later, Dr. Kron examined Green a second time after he was seen by Waupun Podiatry. The podiatrist had acknowledged Green's history with gout, so she recommended gout medication and Tylenol 3. A nurse and Dr. Kron evaluated Green themselves and noted Green

11

showed no signs of having gout. Dr. Kron decided, in part due to concerns about side effects, that gout medication and Tylenol 3 were inappropriate. Green argues that Dr. Kron should have followed the recommendations of the podiatrist for these prescriptions, but it is well settled that "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Courts do "not interfere with a doctor's decisions to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.* Green presents no evidence to support such a conclusion.

Green also suggests that Defendants (Dr. Kron in particular) delayed his surgery with unnecessary consults. Based on the record, no jury could reasonably reach the same conclusion. Dr. Kron ordered a consult with Waupun Podiatry after the scheduler was unable to reschedule the surgery at Divine Savior. The podiatrist at Waupun Podiatry refused to see Green again after examining him because Green made statements suggesting he would not comply with post-op care and because he acted disrespectfully toward her. Green was then referred back to Divine Savior. The podiatrist from Divine Savior also expressed concerns about Green's compliance with post-op care, which required that Dr. Jeanpierre consult with the Department of Corrections Medical Director about Green's treatment. During this time, Dr. Jeanpierre referred Green to UW Orthopedics in an attempt to find other ways to address his toe pain. Although there was some delay in rescheduling the surgery, the delay was caused by Green's own actions, by concerns raised by offsite providers, and by availability at the offsite providers. No jury could reasonably conclude that the delay was a result of Defendants' deliberate indifference to Green's foot condition.

12

Finally, while Green waited for the surgery, Defendants, other health services staff, and specialists regularly evaluated him; Green's pain medications were adjusted; he was provided with an extra pillow, compression socks, and ice; he was approved for two pairs of orthopedic shoes; and he was educated on stretching exercises. Considering the totality of the care Green received, no reasonable jury could find that Defendants were deliberately indifferent to his foot condition and pain. They are entitled to summary judgment on these claims.

**B. Catheters and Abdominal Mesh**

Green also asserts that Dr. Kron was deliberately indifferent to his bladder condition when he decided to change the frequency of Green's catheter replacements from daily to weekly. Dr. Kron explains this change was consistent with Waupun's policy regarding the frequency of replacement catheters, and Green presents no evidence to support a conclusion that daily replacements are medically necessary. To the contrary, Dr. Kron presents evidence showing that catheters can be used for two to four weeks before being replaced. Dkt. No. 57 at 6 (citing *Intermittent Catheters for Chronic Urinary Retention: A Health Technology Assessment*, ONTARIO HEALTH TECHNOLOGY ASSESSMENT SERIES (Feb. 19, 2019), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6395058/#appendix3title). Green also fails to present any evidence to suggest that Dr. Kron knew when he made the change that Green would be harmed by such a change. Green simply registers his disagreement with the decision, which, as previously explained, is insufficient to establish an Eighth Amendment violation. In any event, Green was once again provided with daily replacements within a week of Dr. Kron's order, showing again how responsive health services was to his complaints.

Finally, Green's assertion that Defendants (Meli in particular) demonstrated deliberate indifference when they refused to schedule surgery to have mesh in his abdomen removed is

13

without merit because the evidence shows that Green never had mesh in his abdomen. Further, in response to Green's persistent complaints of stomach pain, he has been scheduled for numerous diagnostic tests, including an ultrasound, CT scan, EGD, and colonoscopy in an effort to diagnose the source of his discomfort. Such efforts are inconsistent with a finding of deliberate indifference. *See Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018); *McGee v. Adams*, 721 F.3d 474, 482 (7th Cir. 2013) (finding that "meaningful and ongoing assessment of a patient's condition is the antithesis of 'deliberate indifference'"). Defendants are entitled to summary judgment on these claims.

**C. State Law Medical Negligence Claims**

For Green's medical negligence claims to survive summary judgment, he had to present evidence that Defendants "fail[ed] to exercise that degree of care and skill usually employed by the average practitioner under similar circumstances." *Ande v. Rock*, 647 N.W.2d 265, 271 (Wis. App. 2002); *see also Wilson v. Adams*, 901 F.3d 816, 823 (7th Cir. 2018) (applying Wisconsin law). "Medical experts are typically needed to establish the standard of care." *Ajala v. Univ. of Wis. Hosp. & Clinics*, No. 19-3423, 2020 WL 6791486, at *4 (7th Cir. Nov. 19, 2020) (citing *Wilson*, 901 F.3d at 823). Defendants argue that Green's medical negligence claims must be dismissed because he fails to produce an expert opinion on the standard of care and causation. Dkt. Nos. 44 at 12–13; 68 at 14–15. Green references records from his podiatrist and argues that he will call the podiatrist as a witness at trial.

The podiatrist's records are insufficient to satisfy Green's burden because they do not include an opinion regarding the proper standard of care or whether Defendants provided proper care. *See Wilson*, 901 F.3d at 823. Green's assurances about the evidence he may provide at trial are also insufficient. Summary judgment "is the put up or shut up moment in a lawsuit, when a

14

party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks and citations omitted). Without expert testimony, Green cannot prove a medical negligence claim. Defendants are entitled to summary judgment.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motions for summary judgment (Dkt. Nos. 43 and 67) are **GRANTED**.

**IT IS FURTHER ORDERED** that Green's motions for summary judgment (Dkt. Nos. 50 and 79) are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Kron's motion to strike (Dkt. No. 87) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that this case is dismissed. The Clerk is directed to enter judgment accordingly.

Dated at Green Bay, Wisconsin this 30th day of December, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge